**TOYOTA MOTOR SALES, U.S.A., INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Consol. Court No. 81–1–00048.**

United States Court of International Trade.

April 10, 1984.

Cladouhos & Brashares, Washington, D.C., David D. Laufer, Los Angeles, Cal., of counsel (Harry W. Cladouhos, William C. Brashares, Paul M. Laurenza, Mari-Anne Pisarri, Washington, D.C., on the briefs), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., Joseph I. Liebman, Intern. Trade Field Office, New York City, of counsel (Saul Davis and Michael P. Maxwell, New York City, on the brief), for defendant.

MALETZ, Senior Judge:

This case concerns the proper classification of automotive cab chassis imported from Japan from January 1980 through July 1981. The chassis component of the import consists of a frame, suspension system, wheels, engine, and steering mechanism. The cab portion contains seats, a floor, doors, back panel, instrument panel, windows, climate control system, radio, and trim. When combined the cab and chassis

comprise a fully operable motor vehicle. The following depicts a typical cab chassis as it looks upon importation.

After importation, a cargo-carrying, work-performing or passenger-carrying adjunct is added to the rear of the vehicle. When that adjunct is a cargo box the vehicle becomes a pickup truck. Other configurations render the vehicle a camper or recreational vehicle. In the vast majority of cases cab chassis are completed into pickup trucks.

These cab chassis were classified by the Customs Service under item 692.02 of the Tariff Schedules of the United States (TSUS) as unfinished automobile trucks valued at $1,000 or more. *See* General Interpretative Rule 10(h). The dutiable rate for item 692.02 is 25 percent ad valorem. *See* item 945.69 of the Appendix to the TSUS. Plaintiff Toyota Motor Sales maintains that the imports are classifiable under item 692.20, the eo nomine provision for automobile truck chassis, at a rate of 4 percent ad valorem. Alternatively, Toyota claims the cab chassis are classifiable under item 692.10 as "other" motor vehicles for the transport of persons or articles at the rate of 2.8 percent ad valorem.

The TSUS provisions for the classification and various claims are as follows:

GENERAL HEADNOTES AND RULES OF INTERPRETATION:

10. General Interpretative Rules. — For the purposes of these schedules —

\* \* \* \* \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

\* \* \* \* \*

Schedule 6, Part 6, Subpart B:

Motor vehicles (except motorcycles) for the transport of persons or articles:

Automobile trucks valued at $1,000 or more, and motor buses:

| | | |
|---|---|---|
| 692.02 | Automobile trucks | 8.5% ad val.[1] |
| | \* \* \* \* \* | |
| 692.10 | Other | 2.9% ad val. |
| | \* \* \* \* \* | |

Chassis, bodies (including cabs), and parts of the foregoing motor vehicles:

Bodies (including cabs) and chassis:

| | | |
|---|---|---|
| 692.20 | For automobile trucks and motor buses | 4% ad val. |
| | \* \* \* \* \* | |

1 Rate temporarily increased. See item 945.69 in part 2B, Appendix to Tariff Schedules.

Appendix to the Tariff Schedules, Part 2, Subpart B:

945.69 Automobile trucks valued $1,000 or more (provided for in item 692.-02) ..................................................... 25% ad val.

Although Toyota has launched a multipronged attack, the essence of its argument is that cab chassis cannot be classified as trucks under item 692.02 because they are not within the common meaning of "truck," but come within the common meaning of "chassis." The court is not convinced and believes that the government's classification is correct. Accordingly, judgment shall enter for defendant.

*Background*

This action had its genesis in 1963 with the so-called "Chicken War Proclamation."[1] That proclamation changed the rate for automobile trucks valued over $1,000 from 8.5 percent to 25 percent. While not salient to Toyota in 1963, it was soon to figure prominently in Toyota's U.S. market.

Prior to 1971 Toyota pickup trucks imported into the United States were valued under $1,000 and, consequently, were classified under item 692.10 as other motor vehicles at the then prevailing rate of 3.5 percent ad valorem. Because the value of its U.S.-destined pickup trucks would soon exceed $1,000, Toyota wrote to Customs on November 13, 1971, seeking an advisory ruling as to the classification of its pickup trucks if imported as a cab chassis, i.e., without the rear bed assembly. Toyota suggested in that letter that the cab chassis be classified under item 692.10—as other motor vehicles valued under $1,000. It further requested that the rear bed assembly be classified under item 692.20 as chassis or bodies for automobiles trucks, or under item 692.27 as other parts of motor vehicles. Although Toyota specifically requested that only the rear bed assembly— the cargo box—be classified under item 692.20 as a body for automobile trucks, Customs, in a reply letter dated March 22, 1972, advised Toyota that the imported cab chassis would be classifiable as chassis under item 692.20 at the then prevailing rate of 5 percent ad valorem. Toyota's cab

chassis were so classified and continued to be so classified until 1980.

In that year this admittedly established and uniform administrative practice was changed by Customs in T.D. 80–137, 45 Fed.Reg. 35,057 (1980). Relying on the principles announced six months earlier in *Daisy-Heddon v. United States,* 66 CCPA 97, C.A.D. 1228, 600 F.2d 799 (1979), Customs concluded that its past practice was clearly wrong. Briefly, *Daisy-Heddon* held that substantial completion, not essentiality, was the test to be applied in determining whether an article could be classified as unfinished under General Interpretative Rule 10(h). Relying on the guidelines set forth in *Daisy-Heddon,* Customs determined that the lightweight cab chassis imported by Toyota—those weighing less than 6,000 lbs.—were unfinished automobile trucks dutiable under item 692.02. Customs began classifying plaintiff's imported lightweight cab chassis under that item number. This action soon followed.[2]

The central issue at the trial was whether a cab chassis is a "chassis" within the common meaning of that term as used in item 692.20 of the TSUS. The testimony of various automotive industry experts focused on industry definitions of such terms as "chassis," "cab," "cab chassis," "truck" and "body." Not surprisingly, the testimony was highly controverted on the issue of whether a cab chassis is a "chassis" under industry nomenclature. A flood of exhibits depicting cab chassis denominated as "chassis" were introduced by plaintiff.

1. Effective January 7, 1964, Presidential Proclamation 3564, 77 Stat. 1035 (1963), increased the duty on automobile trucks imported into this country as partial retaliation for the European Economic Community's "unreasonable import restrictions" on imports of poultry from the United States.

2. In its complaint Toyota not only challenges the government's classification as being incorrect as a matter of law, but also alleges (1) that the classification is arbitrary and capricious, and (2) that the government's past practice of classifying cab chassis as chassis is not clearly wrong. *See* discussion *infra.* Inasmuch as this action involves a trial *de novo,* not simply judicial review of an administrative record, *com-*

*pare* 28 U.S.C. § 2640(a)(2) *with* 19 U.S.C. § 1516a(b) (1982), allegations of arbitrary and capricious conduct are misplaced here. *See O'Dwyer v. Commissioner,* 266 F.2d 575 (4th Cir.), *cert. denied,* 361 U.S. 862, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

As to whether the government's past practice was clearly wrong, this portion of plaintiff's complaint is at best duplicative of and certainly subsumed by that count of its complaint challenging the legal correctness of the government's classification. Again, that is a matter to be considered *de novo* by the court.

For these reasons, counts II and III of Toyota's complaint were dismissed at a pre-trial conference.

The government offered an offsetting number of its own exhibits showing cab chassis denominated as "trucks."

Plaintiff's witnesses, consisting primarily of engineers, sales personnel and planning managers from Toyota, Ford Motor Company, General Motors and Chrysler, testified in the main that the imported cab chassis was considered a "chassis" within the industry. Defendant's witnesses were likewise represented by various segments of the truck industry. There was a consensus among the government's witnesses that a cab chassis is not a chassis as that term is understood within the industry, with some of the government's witnesses considering a cab chassis to be an incomplete truck, others believing it to be a truck.

Despite the contrariety of opinion, on one point all witnesses agreed—a pickup truck consists of three major components: the chassis, the cab and the cargo box. By stipulation the parties further agreed that 97.2 percent of imported cab chassis are completed into pickup trucks by the addition of a cargo box and that the imported cab chassis comprise 90 percent of a complete truck in terms of parts, labor and value.

Against this background, the court considers the threshold question of the common meaning of "chassis."

### Common Meaning

One of the pivotal issues in this case is whether the imported cab chassis comes within the common meaning of the eo nomine provision for chassis in item 692.20. The law regarding common meaning is well-established. First, tariff terms are construed in accordance with their common and commercial meaning, *Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA ——, 673 F.2d 380 (1982), and it is presumed that Congress framed the tariff acts according to the general usage and denomination of the trade. *Nylos Trading Co. v. United States*, 37 CCPA 71, C.A.D. 422 (1949). Second, the common meaning of a tariff term is a question of law to be determined by the court. *American Ex-*

*press Co. v. United States*, 39 CCPA 8, C.A.D. 456 (1951). In answering the question of a term's common meaning courts may consult dictionaries, lexicons, scientific authorities and other reliable sources as an aid. *C.J. Tower & Sons v. United States*, 69 CCPA ——, 673 F.2d 1268 (1982). Third, the meaning to be given a descriptive term used in a tariff act is that which it had at the time of the law's enactment. *United States v. O. Brager-Larsen*, 36 CCPA 1, 3–4, C.A.D. 388 (1948). A subsequent definition may not be used to expand the meaning of a term, but is an aid to clarifying it. *Sears Roebuck & Co. v. United States*, 46 CCPA 79, 82, C.A.D. 701 (1959).

With these principles in mind, the court begins by noting the definition of chassis contained in the Handbook of the Society of Automotive Engineers (1963) (the SAE Handbook). Under the section entitled, "Commercial Motor Vehicle Nomenclature—SAE J687a," "motor vehicle chassis" is defined as

> the basic operative motor vehicle including engine, frame, and other essential structure and mechanical parts, but exclusive of body and all appurtenances for the accommodation of operator, property or passengers, and/or appliances or equipment related to other than locomotion and control. If a cab is included, the designation should be: MOTOR VEHICLE CHASSIS WITH CAB.

The SAE definition makes clear that a cab is not part of a chassis, specifically excluding "all appurtenances for the accommodation of operator, property or passengers." The record is abundantly clear that the cab portion of a cab chassis is that appurtenance which accommodates the operator and passengers. Furthermore, the definition specifically indicates that "[i]f a cab is included" the article is not a chassis but rather a "MOTOR VEHICLE CHASSIS WITH CAB," indicating that the term "chassis," standing alone, does not include a cab.

The court considers this SAE definition to be a highly authoritative source of industry nomenclature, particularly since the

SAE is an organization which represents all aspects of the automotive industry. The definition is the work product of the SAE Commercial Vehicle Nomenclature Committee whose purpose it is to formulate standard nomenclature within the truck industry. The process begins with a staff engineer who drafts a definition. The Committee reviews this draft over an extensive period of time, and then circulates it to a broad cross section of the industry, including governmental agencies, for review before final publication in the SAE Handbook. Considering the great care and exhaustiveness of the process, the SAE definition is entitled to great weight.

What is more, not only is the cab excluded from the SAE definition of chassis, but every lexicographic definition consulted by the court likewise omitted it. The following definitions of chassis, dating from the enactment of the TSUS, are overwhelmingly consistent, none describing the imported cab chassis as a chassis.

First, Funk & Wagnalls Standard Dictionary of the English Language (Int'l ed. combined with Britannica World Language Dictionary 1963), defines a chassis as follows:

> The frame and springs of a motor vehicle: also, all other mechanical parts of the car, including the wheels and motor.

In 2 Encyclopedia Americana 834 (Int'l ed. 1973), chassis is defined as

> the complete car minus the body. The chassis therefore consists of the engine, power-transmission system, and suspension system all suitably attached to, or suspended from, a structurally independent frame....

And in 1 McGraw-Hill Encyclopedia of Science and Technology 750, 754 (1977), the following definition and depiction of a chassis are found:

> A bare vehicle (minus body) with frame, power plant, power train, brakes, and wheels, and cooling, fuel, exhaust, electrical, lubrication, steering, and suspension systems assembled and operational.

Other lexicographic sources consulted by the court corroborate these three definitions. *See, e.g.,* Webster's New Collegiate Dictionary (7th ed. 1967); McGraw-Hill Dictionary of Scientific & Technical Terms (2d ed. 1978); 16 Collier's Encyclopedia 638 (1979); 2 The New Encyclopedia Britannica 776 (micropedia 1982).

■ While it appears clear to the court, on the strength of these sources alone, that a cab chassis is not a chassis, the parties nevertheless presented a wealth of testimony in an effort to show that industry usage of the terms in issue here supports their respective positions. Although this record may serve as an aid, it is not, of course, binding. *See, e.g., Tropical Craft Corp. v. United States,* 45 CCPA 59, 61, C.A.D. 673 (1958) (testimony as to common meaning advisory only, and insufficient to overcome contrary dictionary definitions); *Package Machinery Co. v. United States,* 41 CCPA 63, 66, C.A.D. 530 (1953) (testimony as to common meaning accorded such weight as court deems proper). The record is illuminating insofar as the court's understanding of the background surrounding this controversy. But the evidence is at best in virtual equipoise; at worst it is a controverted snarl.

Toyota's seven witnesses testified that the term "chassis" was commonly used in the industry to describe a cab chassis as well as other chassis configurations. This testimony was documented by numerous references to cab chassis in trade literature, automotive histories, advertising brochures and certain government specifications. The government, in opposition, produced ten witnesses who testified that the cab chassis was not a "chassis," but was instead a truck, either complete or incomplete. The government likewise documented this testimony through the use of trade

literature, automotive histories and advertising brochures.

To highlight just how conflicting the evidence is one need only consider the trade literature offered at trial. For example, a truck data book prepared by General Motors in 1964 describes a chassis as

1—Entire vehicle as produced by the factory when no body is included (Cab, frame, power plant, drive line, suspensions, axles, wheels and tires); 2—same as number 1 except excluding cab and other sheet metal; or 3—Frame only with brackets, bumper and other miscellaneous parts directly attached to the frame.

By contrast, a truck facts book prepared by the Ford Motor Company in 1978 defines a chassis as

[t]he basic truck consisting of frame, springs, axles, wheels, tires, engine and steering wheel (without sheet metal, cab or body).

A Department of Defense publication, on the other hand, entitled "Federal Item Name Directory for Supply Cataloging (1982)," defines "chassis" as follows:

A self-propelled wheeled vehicle undercarriage consisting essentially of the frame and power trains, with or without cab, designed primarily to mount a suitable body for transporting supplies and/or equipment.

Also introduced were countless advertisements dating from the birth of the industry to the present containing depictions of cab chassis with the caption "chassis," and a countervailing number of similar pictorial examples of cab chassis labelled "trucks."

The only credible explanation for this seemingly hopeless conflict is that the terms "chassis," "cab chassis" and "truck" are frequently used very loosely, at times interchangeably, throughout the automotive industry, depending on which segment of the industry is the focus, e.g., the parts, service and repair sector; manufacturing and assembly; or engineering. Given these considerations, the court finds these examples of industry usage of little value or assistance.

From all of this, the court believes that the lexicographic sources point the way—the common meaning of chassis does not include a cab chassis. This conclusion finds strong support in the legislative history to item 692.20.

### Legislative History

As previously indicated, Congress is presumed to know the common meaning of terms and to have framed tariff terms accordingly. *See, e.g., Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA —, 673 F.2d 380 (1982); *United States v. C.J. Tower & Sons*, 48 CCPA 87, C.A.D. 770 (1961). Where a contrary legislative intent appears, however, the common meaning is supplanted for customs purposes. *Garay & Co. v. United States*, 83 Cust.Ct. 6, C.D. 4813 (1979). Here, the legislative history shows (1) that Congress used the term "chassis" as it is ordinarily understood, and (2) that a "cab chassis" is not properly classifiable as a chassis. Indeed, an examination of the legislative history indicates that cab chassis should be classified as unfinished trucks. Particularly telling in this connection is the Brussels Nomenclature.

Courts and Congress recognize that the Nomenclature for the Classification of Goods in Customs Tariffs (generally referred to as the "Brussels Nomenclature" or simply "Brussels") is a highly probative source for ascertaining legislative intent, especially where the language of the TSUS and Brussels are similar. *See, e.g., United States v. Abbey Rents*, 66 CCPA 2, 4 n. 5, C.A.D. 1213, 585 F.2d 501, 504 n. 5 (1978); *Schwarz v. United States*, 57 CCPA 19, C.A.D. 971, 417 F.2d 1391 (1969). *See also* Tariff Classification Study Submitting Report 8 (Nov. 15, 1960) ("The 'Brussels Nomenclature' [and one other classification manual] exerted the greatest influence on the arrangement of the proposed revised schedules [i.e., the TSUS]."). The only condition precedent to using Brussels is the existence of a nexus between the language

in Brussels and its counterpart in the TSUS. *Mattel, Inc. v. United States,* 65 Cust.Ct. 616, 625, C.D. 4147 (1970). *See also Abbey Rents; S.G.B. Steel & Scaffolding Co. v. United States,* 82 Cust.Ct. 197, C.D. 4802 (1979). That nexus is present here. In fact, this court has previously used Brussels to discern the legislative intent surrounding this very subpart of the TSUS. *The Carrington Co. v. United States,* 70 Cust.Ct. 105, 112, C.D. 4415, 358 F.Supp. 1286, 1291–92 (1973), *aff'd,* 61 CCPA 77, C.A.D. 1126, 497 F.2d 902 (1974).

Turning to an examination of Brussels, it provides as follows regarding motor vehicles:

Heading 87.02—Motor Vehicles For The Transport Of Persons, Goods Or Materials (Including Sports Motor Vehicles, Other Than Those Of Heading No. 87.-09 [i.e., motorcycles]).

By comparison, the main superior heading which encompasses TSUS item 692.02 (the provision under which the cab chassis were classified), reads as follows:

Motor vehicles (except motorcycles) for the transport of persons or articles.

Brussels and the TSUS are thus virtually identical vis-a-vis their respective main headings. There is an indisputable nexus between the two. Brussels continues:

Heading 87.04—Chassis Fitted With Engines, For The Motor Vehicles Falling Within Heading No. 87.01, 87.02 Or 87.-03.

Heading 87.05—Bodies (Including Cabs), For The Motor Vehicles Falling Within Heading No. 87.01, 87.02 Or 87.03.

Heading 87.06—Parts And Accessories Of The Motor Vehicles Falling Within Heading No. 87.01, 87.02 Or 87.03.

The main superior heading for item 692.20, which plaintiff claims is the proper classification, again is remarkably comparable, representing a distillation of these three Brussels headings:

Chassis, bodies (including cabs), and parts of the foregoing motor vehicles:

Thus, as was the case with the classification for motor vehicles, the Brussels and TSUS provisions which encompass plain-tiff's claimed classification mirror each other. Under the dictum of *Abbey Rents,* 66 CCPA at 4 n. 5, 585 F.2d at 504 n. 5, and the statement of reliance in Congress' Submitting Report, the legislative intent behind these TSUS provisions can properly be gleaned from Brussels, given their close similarity. Congress most certainly relied on Brussels when drafting these TSUS provisions. Their similarity is, in fact, so striking that it is unquestionably more than just a coincidence that they track so closely. Against this backdrop, the Explanatory Notes to the Brussels Nomenclature (1955) irrefutably demonstrate that cab chassis are not chassis, but rather are motor vehicles.

The Explanatory Notes to Heading 87.04, the Brussels heading directly corresponding to the main superior heading for plaintiff's claimed provision, TSUS item 692.20 (the chassis provision), specifically exclude cab chassis from the chassis classification, placing them within the heading for motor vehicles. Thus, those Notes exclude from heading 87.04

[c]hassis fitted with engines *and cabs,* whether or not the cab is complete (*e.g.,* without seat) (*heading 87.02*) (see Chapter Note 2). [Emphasis added.]

Further, the Explanatory Notes to Heading 87.02—the provision encompassing trucks—provides:

Motor vehicle chassis, fitted with an engine *and cab,* are also classified here. [Emphasis added.]

The Brussels explanation of the term "chassis" is persuasive of what Congress intended when it used that same term in the TSUS. *See Quigley & Manard, Inc. v. United States,* 75 Cust.Ct. 49, 57 C.D. 4607 (1975). When Congress enacted the main superior heading for item 692.20, the conclusion becomes inescapable that it did not intend to include chassis fitted with an engine and cab within the main superior heading for chassis. *See Schwarz v. United States,* 57 CCPA at 22–23, 417 F.2d at 1393–94 (Explanatory Notes to Brussels in-

dicate that subject imports not included under claimed TSUS provision).

One further indicia of congressional intent is that portion of item 692.20 which provides "bodies (including cabs)". Had Congress intended to have cabs considered as part of a chassis, it would have drafted item 692.20 to provide "chassis (including cabs)," or words to that effect. The fact that a cab is provided for eo nomine in item 692.20 indicates that it was neither intended to fall within the residual parts provision nor is it just part of a chassis. Rather, it is a significant component which Congress chose to categorize as part of a truck body or as a type of truck body.

■ All in all, where Congress in plain language has expressed its intention, and the legislative history does not demonstrate a contrary purpose, this court is bound to follow the statutory provision as written. *Schramm v. Department of Health & Human Services*, 682 F.2d 85, 91 (3d Cir.1982). The Supreme Court has in fact warned that "[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent 'is a step to be taken cautiously' even under the best circumstances." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982) (quoting *Piper v. Chris-Craft Industries*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)). Indeed, "[a]bsent a clearly expressed legislative intention to the contrary, [the] language [of the statute] must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). *See Shields v. United States*, 698 F.2d 987, 989 (9th Cir. 1983).

■ In short, an examination of the plain language of item 692.20, together with the legislative history of the TSUS provisions in issue here, reveals that Congress did *not* intend to classify cab chassis within the main superior heading for "chassis, bodies (including cabs), and parts of the foregoing motor vehicles." To the contrary, in light of the Brussels Explanatory Notes, Congress fully intended cab chassis to be classified as a type of motor vehicle.

In the face of this compelling lexicographic and legislative background, Toyota nevertheless insists that a cab chassis is still classifiable as a chassis absent some showing that the cab performs some function independent of and equal to the function of the chassis. Toyota submits that it does not, that the cab's function is incidental, subordinate and secondary to the chassis function. In other words, according to plaintiff, a cab chassis is not more than a chassis.

This argument does not withstand close scrutiny. For "[i]n order to determine if an article is more than that provided for in a particular tariff provision, it is necessary to ascertain the common meaning of the tariff provision and compare it with the merchandise in issue." *E. Green & Son v. United States*, 59 CCPA 31, 34, C.A.D. 1032, 450 F.2d 1396, 1398 (1971). Here, the common meaning of chassis has been shown to definitely exclude the cab. What is more, the difference between a cab chassis and a chassis is quite significant. In *Robert Bosch Corp. v. United States*, 63 Cust.Ct. 96, 103–04, C.D. 3881 (1969), this court elaborated on that factor:

> The principle is well settled that where an article is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant, it cannot find classification within such provision. It is said to be more than the article described in the statute.

■ The record establishes that the addition of the cab to the chassis is indeed significant, rendering a cab chassis more than a chassis. The cab contains the operating and safety features—the sine qua non of an operable vehicle. The cab provides an environment for driver and passengers not present with a chassis alone. It is, in fact, the locus for the attachment of a permanent seat enabling the chassis to become driveable on the road. It is, there-

fore, apparent that the cab is an element which makes a cab chassis more than a chassis, converting it to a motor vehicle. As to which type of motor vehicle, the court next turns its attention.

### The Daisy-Heddon *Factors*

Having established that a lightweight cab chassis is not a chassis, the inquiry then is whether, as the government contends, it is properly classifiable as a truck, unfinished, under item 692.02 and General Interpretative Rule 10(h). Despite the fact that the parties have stipulated that 97 percent of imported cab chassis are completed into trucks, Toyota nevertheless vigorously maintains that a lightweight cab chassis cannot be classified as a truck because it lacks what Toyota considers to be an essential part—a cargo box or other rear adjunct. The court would readily agree that a cab chassis is not strictly speaking a truck. However, that still does not answer the question whether a cab chassis is an *unfinished* truck for tariff purposes under rule 10(h).

Toyota's contention, as the court understands it, is that an incomplete truck missing the cargo box—an "essential" part in Toyota's view—cannot be classified as the article proper because it does not possess the latter's basic characteristics or essence. While that argument might have had some efficacy under former case law, *see Authentic Furniture Products, Inc. v. United States*, 61 CCPA 5, C.A.D. 1109, 486 F.2d 1062 (1973), the court must decline to grasp the handle tendered, for it is totally unavailing under the currently prevailing rule of decision. *See Daisy-Heddon, Div. Victor Comptometer Corp. v. United States*, 66 CCPA 97, C.A.D. 1228, 600 F.2d 799 (1979).

In effect, Toyota's argument represents a thinly veiled attempt to resurrect the "essentiality" test of the *Authentic Furniture* decision. Under that test, the absence of a "substantial or essential part" would preclude classification as the unfinished article and would require classification under the associated parts provision. *Id.*, 61

CCPA at 7, 486 F.2d at 1064. That decision and its test were expressly overruled in *Daisy-Heddon*, 66 CCPA at 102, 600 F.2d at 802, replacing the "essentiality" test with a "substantially complete" yardstick.

In a revealing passage, the CCPA explained why the *Authentic Furniture* rationale could not hold:

> If, as appellant argues, the omission of a part essential to the use of the eo nomine designated article would prevent classification as the article in an unfinished condition, there would be, in practical effect, no such thing as an unfinished article, since the omission of virtually any part from an otherwise complete article would prevent its use in the manner intended. See *Authentic Furniture Products*, 61 CCPA at 8, 486 F.2d at 1064–65 (Miller, J., dissenting). Such is clearly not the intent of Congress, as evidenced by the very existence of General Interpretative Rule 10(h).

*Id.*, 66 CCPA at 102, 600 F.2d at 802. In other words, taken to its logical extreme, the *Authentic Furniture* holding would effectively write rule 10(h) out of the TSUS. *See Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979) ("the elementary canon of construction [is] that a statute should be interpreted so as not to render one part inoperative").

In opting for a "substantially complete" standard, the CCPA set forth the following five factors to guide this court in making the determination whether *vel non* certain merchandise is substantially complete:

> (1) Comparison of the number of omitted parts with the number of included parts; (2) comparison of the time and effort required to complete the article with the time and effort required to place it in its imported condition; (3) comparison of the cost of the included parts with that of the omitted parts; (4) the significance of the omitted parts to the overall functioning of the completed article; and, (5) trade customs, i.e., does the trade recog-

nize the importation as an unfinished article or as merely a part of that article. *Daisy-Heddon,* 66 CCPA at 102, 600 F.2d at 803. The CCPA was quick to add that this list is not exhaustive—on a case by case basis fewer or additional factors could be determinative. *Id.* On the facts of this case, the court is of the view that the five factors delineated above are controlling. Applying these five criteria then to the facts of the present case, the court is convinced that a cab chassis is an unfinished truck.

A. *Total Parts, Labor and Cost.*

The parties have stipulated that the cab chassis portion of a truck vis-a-vis a complete truck represents 90 percent of a completed truck in terms of parts, labor and cost.

B. *Significance of the Omitted Parts vis-a-vis the Completed Article.*

This criterion is the only *Daisy-Heddon* factor which is contested. As previously indicated, Toyota contends that absent the cargo box or other rear adjunct component a cab chassis cannot be considered a truck, finished or unfinished. Toyota believes that the cargo-carrying dimension of a truck is so intrinsic to it that it cannot acquire the quality or nature of "truckness," absent that part. In other words, the cargo box, which gives a truck its full cargo-carrying potential, is not just significant, in Toyota's view; it is the very essence of a truck.

On a philosophical level Toyota's argument makes for an interesting debating point. But in the sphere of law it fails. For whether a cargo box is commercially essential for a cab chassis to be sold as a *complete* truck, or whether it is functionally essential in order for a *complete* truck to haul cargo, is irrelevant. The CCPA plainly held in *Daisy-Heddon* that the question of substantial completeness "does not merely depend on the 'essential' nature, be it functional or commercial, of the omitted [part]." *Id.,* 66 CCPA at 102, 600 F.2d at 802–03. Rather, it turns on "the significance of the omitted part[ ] to the *overall functioning* of the completed article." *Id.,* 66 CCPA at 102, 600 F.2d at 803 (emphasis added).

In the present case the record reflects that in its imported condition a cab chassis has the capacity to carry passengers or cargo. A cab chassis is, in short, nothing less than a fully operable, driveable truck with or without the addition of the cargo box. There is no dispute that the cargo-carrying dimension of lightweight pickup trucks is important, distinguishing them in part from automobiles. And it is also true that the cargo box performs the bulk of that cargo-carrying task. Still, the significance of the cargo box to the overall functioning of this particular truck is not so great as to remove a cab chassis from the class or kind of merchandise denominated "trucks."

Thus, in *Swift Instruments, Inc. v. United States,* 4 CIT 88, 554 F.Supp. 1235 (1982), *aff'd,* 714 F.2d 161 (Fed.Cir.1983), this court concluded that the omission of lenses undeniably essential to the functioning of a complete microscope did not preclude a determination that the imported components were a substantially complete microscope. *Id.,* 4 CIT at 93, 554 F.Supp. at 1239. *A fortiori,* regardless of whether a cargo box is or is not essential to a truck, on the basis of the *Swift Instruments* decision, omission of that particular part cannot foreclose a cab chassis from being classified as an unfinished truck.

C. *Trade Custom.*

Regarding the fifth *Daisy-Heddon* factor, the parties have stipulated that the truck industry recognizes the importation known as cab chassis to be an incomplete vehicle. In fact, the overwhelming weight of the evidence at trial was to the same effect, several witnesses describing a cab chassis as an incomplete truck.

In sum, when juxtaposed to the five *Daisy-Heddon* criteria, a cab chassis in its imported condition is a substantially complete truck. *Compare Yamaha International Corp. v. United States,* 7 CIT ——, Slip Op. 84–20 (March 9, 1984) (elec-

tronic musical organ lacking a cabinet properly classified as unfinished musical instrument). Consideration of those factors leads the court to conclude that omission of a cargo box or other rear adjunct from a cab chassis does not remove it from the truck classification.[3]

The court next considers what bearing, if any, Customs' practice prior to 1980 of classifying cab chassis as chassis has on this action.

### Administrative Practice

While the foregoing discussion of common meaning, legislative intent and the *Daisy-Heddon* factors impels the conclusion that the imported merchandise is properly classifiable as an unfinished truck, that conclusion runs counter to a prior Customs practice of classifying cab chassis as chassis from 1963 to 1980. As indicated, this practice was changed in 1980, *see* T.D. 80–137, giving rise to this present litigation. Although plaintiff places great reliance on that pre-1980 practice in support of its claim, the court finds that practice of little comfort. For, regardless of the rubrics employed—"compelling reasons" for changing the practice or changing a practice which is "clearly wrong"—that administrative practice was changed because totally without support in the law.

The Customs Service, by its own admission, had classified cab chassis as chassis beginning as far back as 1963. It was the subject of two notices in the Federal Register in 1975. 40 Fed.Reg. 40,190; 40 Fed. Reg. 47,806. This practice received strong

affirmation in 1979 by Secretary of the Treasury W. Michael Blumenthal. In a letter dated January 26, 1979, addressed to Representative Charles A. Vanik, Secretary Blumenthal gave the following reasons in support of Customs' classification of cab chassis as chassis:

> Five primary factors support the classification of cab chassis imports as "chassis" rather than as unfinished automobile trucks: (1) the fundamental customs principle that the tariff classification of an article must be determined by its condition at the time of importation; (2) the fact that an essential part of a truck—the cargo bed—is missing from cab chassis; (3) evidence that legislative history favors the classification of cab chassis as parts; (4) the "chief use" of cab chassis as parts of vehicles and not as vehicles themselves; and (5) administrative practice of long standing.

At the time of this letter the *Authentic Furniture* "essentiality" test, upon which Secretary Blumenthal obviously relied, was still law. However, that decision was expressly rejected some six months after the Blumenthal letter in *Daisy-Heddon*. There, as previously noted, the CCPA held that the determination whether parts of an article constitute their finished counterpart "does not depend merely on the presence or absence of an 'essential' part." *Id.*

With the cornerstone of its practice removed, it became all too clear to Customs that it had to change it to reflect the *Daisy-Heddon* decision.[4] On May 23, 1980,

---

**3.** Toyota further contends that these cab chassis, if not classifiable as chassis, are then properly classifiable as "other" motor vehicles under item 692.10. As the court views it, this represents little more than a slight permutation on plaintiff's argument that a cab chassis cannot be a truck absent a cargo-carrying adjunct. In light of the foregoing discussion, the stipulation that 97 percent of imported cab chassis are ultimately destined to be made into pickup trucks, and the voluminous documentary evidence and trial testimony showing that cab chassis are most often listed within a manufacturer's "truck" product line, a cab chassis is an unfinished truck. In addition, since the provision for "trucks" is more difficult to satisfy than the basket provision "other" motor vehicles, under

the rule of relative specificity—General Interpretative Rule 10(c)—cab chassis must be classified as trucks. *See, e.g., United States v. Astra Trading Corp.,* 44 CCPA 8, C.A.D. 627 (1956); *W & J Sloane, Inc. v. United States,* 76 Cust.Ct. 62, C.D. 4636, 408 F.Supp. 1392 (1976) (eo nomine designation prevails over words of general description).

**4.** In further recognition that an agency cannot change its established and uniform practices at whim, *see, e.g., Atchison, T. & S.F.R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973), Customs had adopted the following regulation to guide its actions in this respect:

Treasury Decision 80–137 was published, providing in part:

> After careful consideration of all comments received Customs has concluded that the present practice of classifying cab chassis as chassis under item 692.20, TSUS, is clearly wrong with respect to lightweight cab chassis. These imports will be reclassified as unfinished automobile trucks, pursuant to general interpretative rule 10(h) of the TSUS and the Court of Customs and Patent Appeals decision in *Daisy-Heddon,* supra.

In the court's view the *Daisy-Heddon* decision, coupled with the common meaning of the term "chassis" and the legislative history of the TSUS, provide compelling reasons for rejecting Customs' past practice.

In interpreting a statute a longstanding administrative practice is entitled to deference by the courts, even where, as here, judicial review is *de novo. See, e.g., Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). At the same time, however, there is no rule of administrative *stare decisis. Bankamerica Corp. v. United States,* —— U.S. ——, 103 S.Ct. 2266, 2281, 76 L.Ed.2d 456 (1983) (White, J., dissenting). Agency practice, once established, is not frozen in perpetuity. Agencies frequently adopt one interpretation of a statute and then, years later, adopt a different view. As long as the new interpretation is consistent with congressional intent, an agency may make a "course correction." *Compare NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 264–66, 95 S.Ct. 959, 967–68, 43 L.Ed.2d 171 (1975); *United States v. City of San Francisco,* 310 U.S. 16, 31–32, 60 S.Ct. 749, 757, 84 L. Ed. 1050 (1940); *and United States v. Jules Raunheim, Inc.,* 17 CCPA 425, 431, T.D. 43,867 (1930) ("an administrative practice in plain violation of the terms of the statute cannot be urged as determining the construction that should be given to it"), *with Hardee v. United States,* 708 F.2d 661, 668 (Fed.Cir.1983) (60-year practice by IRS, expressly endorsed by tax court, could not be administratively altered since "[t]he view that the receipt of interest-free loans is not a taxable event ... has hardened into a rule of law [and] is not grossly erroneous."). The court believes that Customs' present interpretation of items 692.02 and 692.20 is entirely consonant with what Congress intended.

Undaunted, Toyota persists by adding that Congress acquiesced in Customs' practice of classifying cab chassis as chassis, resulting in legislative ratification of that former practice. The court is not persuaded. First of all, the legislative history of the TSUS shows that Congress did not intend cab chassis to be classified as chassis. Secondly, an examination of the legislative history of the Tariff Schedules Technical Amendments Act of 1965, Pub.L.No. 89–241, 79 Stat. 933, and the Automotive Products Trade Act, Pub.L. No. 89–283, 79 Stat. 1016 (1965)—the only two relevant post-TSUS enactments—discloses no reference to the then nascent administrative practice of classifying cab chassis as chassis. There is simply no hint that Congress knew of this practice in 1965, undermining Toyota's ratification argument as of that date. *See* 1 K. Davis, Administrative Law Treatise § 5.07 at 334 (1958) ("Whenever a congressional awareness of the administrative interpretation does not appear and seems unlikely, the basis for the reenactment rule vanishes."); Griswold, *A Summary of the Regulations Problem,* 54 Harv.L.Rev. 398, 400 (1941) ("the mere reenactment of a statute following administrative construction should be given no weight whatever in determining the proper

*Rulings regarding a rate of duty or charge. . . .* No ruling published under the provisions of this section will have the effect of changing either an earlier published ruling or a practice established by other means by imposing a higher rate of duty or charge on an article unless the earlier ruling or practice has been determined to be clearly wrong.

19 C.F.R. § 177.10(b). *See also* 19 U.S.C. § 1315(d) (Supp. IV 1980). There is no dispute here that Customs properly changed its practice insofar as the procedural aspects of that change are concerned.

construction of the statute [emphasis deleted]").

■ In the face of a silent congressional record, an administrative practice must at a minimum be long-standing before the conclusion can be fairly drawn that Congress has acquiesced in it. *See, e.g., Dames & Moore v. Regan*, 453 U.S. 654, 686, 101 S.Ct. 2972, 2990, 69 L.Ed.2d 918 (1981) (" 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent....' " (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915)); *Zenith Radio Corp.*, 437 U.S. at 457, 98 S.Ct. at 2448–49; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–82, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *Helvering v. Winmill*, 305 U.S. 79, 82–83, 59 S.Ct. 45, 46–47, 83 L.Ed. 52 (1938); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 84, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932). The court does not consider an administrative practice of three-years' duration as of 1965, which up until then had not been the subject of any published rulings, to be either long-standing or established. *Compare CBS, Inc. v. FCC*, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981) (eight-year practice); *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981) (fifteen-year practice); *Red Lion Broadcasting*, 395 U.S. at 382, 89 S.Ct. at 1802 (thirty-year practice).

During the hiatus from 1965 to 1978 there is no indication that Congress either knew of or gave this practice any consideration. However, it is uncontroverted that in 1978 Congress specifically focused on this practice. In that year the House Ways and Means Committee, through Representative Vanik, directed the General Accounting office to examine this issue and to report back to Congress. *See* Report by the Comptroller General of the United States, GGD 79–19 (Dec. 13, 1978). The GAO was of the opinion that the practice was questionable. Congressman Vanik

then asked the International Trade Commission for its evaluation of the GAO report. The ITC report concluded that the cab chassis classification was clearly wrong. *See* Assessment of the Report of the Comptroller (May 18, 1979). In the interim, as noted, Secretary Blumenthal wrote to Congressman Vanik defending Customs' position on the strength of *Authentic Furniture*.

Within five months of the ITC report and ten months of the GAO report Customs published a notice in the Federal Register advising that, in view of *Daisy-Heddon*, it was reconsidering its practice of classifying cab chassis as chassis. 44 Fed.Reg. 59,984 (1979). On May 23, 1980, T.D. 80–137 was published, effective August 21, 1980.

From the moment Customs expressed its intention of reconsidering its cab chassis classification, Congress viewed the administrative proceedings silently from the wings. To date, over three and one-half years after its publication, Congress has remained silent as to the propriety of T.D. 80–137, although fully aware of its existence. Thus, if there is an argument to be successfully made that Congress has acquiesced in an administrative practice, that argument rests with the government.

■ Finally, Toyota quarrels with Customs' continued practice of classifying "mediumweight" and "heavyweight" cab chassis as chassis, contending that Customs wants it both ways. While sympathetic to Toyota's view, the court is nevertheless hard-pressed to see how this practice has any bearing on the outcome of the present controversy since that is not the practice confronting the court. This is not to say, of course, that Customs' treatment of medium and heavyweight cab chassis as chassis is correct. Nevertheless, disparate treatment of seemingly similar merchandise does not vitiate the conclusion that compelling reasons exist for finding Customs' past practice clearly wrong. *See Castaneda-Gonzalez v. INS*, 564 F.2d 417, 428 n. 25 (D.C.Cir.1977) ("The fact that an erroneous administrative interpretation of

the law in one context is not correctable by the courts because it is unreviewable is no reason for the courts to adopt it as the governing standard for administrative action which is reviewable."). *See also International Spring Mfg Co. v. United States,* 85 Cust.Ct. 5, 10, C.D. 4862, 496 F.Supp. 279, 283 (1980), *aff'd,* 68 CCPA 13, C.A.D. 1257, 641 F.2d 875 (1981).

Based on the common meaning of "chassis," the foregoing legislative history, *Daisy-Heddon* and the entire record, the government's present course is the correct one. Its failure to adhere to that course in the past cannot be urged as an excuse for now ignoring the true congressional intent, *Jules Raunheim, Inc.,* 17 CCPA at 431, for no court is bound by an administrative interpretation which does not comport with that intent. *M.M. & P. Maritime Advancement, Training, Education & Safety Program v. Department of Commerce,* 729 F.2d 748, 754 (Fed.Cir. 1984); *United States v. Sumitomo Shoji,* 63 CCPA 79, 83, C.A.D. 1169, 534 F.2d 320, 324 (1976).

### Conclusion

For all the foregoing reasons, the court concludes that the government's classification of Toyota's cab chassis is correct. Judgment shall enter, accordingly, for defendant.